UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
TISHA SEARS-BARNETT,

                         Plaintiff,

          -v-                                    5:16-CV-426

SYRACUSE COMMUNITY HEALTH
CENTER, INC., JOCELYN SHANNON,
JOHN DOE(S), and JANE DOE(S),

                         Defendants.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

BOSMAN LAW FIRM, LLC                  AJ BOSMAN, ESQ.
Attorneys for Plaintiff
3000 McConnellsville Road
Blossvale, New York 13308

HANCOCK ESTABROOK, LLP                LINDSEY H. HAZELTON, ESQ.
Attorneys for Defendants              WHITNEY M. KUMMEROW, ESQ.
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiff Tisha Sears-Barnett[1] ("Sears-Barnett" or "plaintiff") worked as an accountant for defendant Syracuse Community Health Center, Inc. ("SCHC") from April 12, 2012 until November 27, 2014.  For most of her time with SCHC, Jocelyn Shannon ("Shannon" and together with SCHC "defendants") was her supervisor.  According to plaintiff, Shannon would routinely sexually harass her, and that sexual harassment ranged from making suggestive comments to slapping her backside.

Sears-Barnett complained to SCHC's human resources director about Shannon's behavior, which led to Shannon's being disciplined and removed as plaintiff's supervisor.  Not long after that, plaintiff injured her foot due to a malfunctioning filing cabinet in the office.  Plaintiff alleges that defendants created a hostile work environment between their mishandling of Shannon's sexual harassment and their mistreatment of plaintiff after she injured her foot on the job.

As a consequence, plaintiff brought a ten-count complaint on September 10, 2015, alleging: (I) a hostile work environment under Title VII of the Civil Rights Act of 1963 ("Title VII"); (II) sex discrimination under the New York

---

[1] Plaintiff changed her legal last name from Sears-Barnett to Armstrong during the course of this litigation.  For clarity's sake, the Court will continue to refer to her as Sears-Barnett, the name she used in the complaint and her name in this case's caption.

State Human Rights Law ("NYSHRL"); (III) retaliation under Title VII;

(IV) sex retaliation under the NYSHRL; (V) disability discrimination under

the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of

1973 ("Rehabilitation Act"); (VI) disability discrimination under the

NYSHRL; (VII) retaliation under the ADA and the Rehabilitation Act;

(VIII) disability retaliation under the NYSHRL; (IX) intentional infliction of

emotional distress; and (X) negligence and gross negligence.

Initially, Sears-Barnett filed her complaint in New York State Supreme

Court, Onondaga County. But because plaintiff brought some federal claims,

defendants removed the case to federal court. Eventually, defendants moved

for summary judgment against the entirety of plaintiff's complaint, and the

Court heard oral argument for that motion. Defendants' motion will now be

decided on the parties' submissions and oral arguments.

## II. **BACKGROUND**

SCHC brought Sears-Barnett onboard as an accountant on April 12,

2012.[2] Dkt. 52-5, Defendants' Statement of Material Facts ("DSMF"), ¶ 1. As

an accountant, plaintiff was placed in the Finance Department, which was

Shannon's supervisory domain. *Id.* ¶¶ 1-2.

---

[2] The facts are taken from defendants' statement of material facts where admitted by plaintiff, or from other record evidence. Disputed facts are flagged and supported by citations to either the proponent's statement of material facts or to record evidence.

Shannon's leadership was not without its critics, and those critics included both male and female staff members.  DSMF ¶ 5.  According to Sears-Barnett, one particularly illustrative example of Shannon's management style involved her using several derogatory terms for homosexuals in an altercation with a male employee.  Dkt. 61-8, Plaintiffs' Statement of Material Facts ("PSMF") ¶ 5, *but see* Dkt. 61-7 ("Williams Dep."), pp. 67-69[3] (plaintiff's counsel asking SCHC human resources director whether Shannon had used derogatory terms, with employee initially agreeing, but ultimately stating he did not remember and only remembered reports of Shannon cursing).

Like most workplaces, SCHC maintains anti-harassment and anti-sexual assault policies to deal with precisely those types of altercations.  DSMF ¶ 6.  Sears-Barnett does not dispute that she received copies of those policies.  *Id.* ¶ 7.

Sears-Barnett first turned to SCHC's complaint mechanisms at the end of 2013.  DSMF ¶ 10.  Plaintiff had planned to take a paid day off on November 1 of that year.  Dkt. 52-2 ("Williams Aff."), p. 37.  Despite plaintiff apparently requesting the time off on September 3, 2013, her request was never approved, and she was docked eight hours' pay on her next paycheck.

---

[3] Pagination corresponds with CM/ECF.

*Id.* at 31, 37.  Plaintiff lays the blame for her bungled time off request at Shannon's feet.  *Id.* at 25.

Apparently, Shannon's docking Sears-Barnett's pay created financial difficulties for her, including causing her to overdraft her bank account. Williams Aff. pp. 32-33.  To fix this mistake, plaintiff sent at least eight emails to Craig Williams ("Williams"), SCHC's Director of Human Resources, between November 21 and December 11, 2013.  *Id.* ¶ 1, *see id.* at 25-32.  On November 22, 2013, plaintiff also sent a memorandum to Dr. Ruben Cowart ("Dr. Cowart"), SCHC's president and CEO, to apprise him of her difficulties seeking reimbursement for her leave.  *Id.* at 37, 42.  Ultimately, SCHC paid plaintiff both for her docked pay and the overdraft fees.  *Id.* at 32-33.

If the time off dispute created bad blood between Sears-Barnett and Shannon, their employment dynamic shattered beyond repair in February of 2014.  Plaintiff alleges that on the afternoon of February 11, 2014, Shannon winked at her and slapped her on the backside.  Williams Aff. p. 39.  In addition, she claims that on February 12 Shannon stood close to her with her "arms wrapped around [plaintiff's] right shoulder."  Williams Aff. p. 40. According to plaintiff, Shannon then leaned closer and said she was "trying to behave and keep [her] hands to [her]self" but that she was "having an issue." *Id.*

That same day, Sears-Barnett complained to Williams that Shannon had sexually harassed her during at least the February 11 and February 12 incidents.  DSMF ¶ 12.  The parties do not argue over whether plaintiff told Williams about her encounters with Shannon on February 11 or 12 of 2014. *Id.* ¶ 13.  Nor could they.  She sent Williams a pair of emails, one elaborating on each incident, the same day she complained to him. Williams Aff. pp. 39-40.  But whether those two incidents were the only ones brought to Williams' attention is a more contentious story.

Sears-Barnett alleges not only that were there a host of other incidents of Shannon harassing her, but that she told Williams of each of them. PSMF ¶ 14.  Plaintiff affirms that she told Williams that Shannon had previously slapped her backside on February 5, 2014, and had also unbuttoned her shirt in front of her in the summer of 2012 and asked her if she "liked it."  Dkt. 61 ("Pl. Aff.") ¶¶ 8, 11.  Plaintiff's affirmation also lists a number of further transgressions, including Shannon invading plaintiff's personal space, rubbing her arms, Shannon pressing her breasts against plaintiff, kissing plaintiff's forehead, and talking about the type and color of the underwear Shannon was wearing.  *Id.* ¶ 4.

A skeptical reader might ask why Sears-Barnett did not write about those incidents while sending Williams the emails detailing Shannon's alleged harassing behaviors.  To those skeptics, plaintiff would answer that Williams

told her to only reduce the February 11 and 12, 2014 incidents to writing. Dkt. 61-4 ("Pl. Dep."), p. 124.

It must be said, however, that Sears-Barnett's narrative is a bit murky on that score. At her deposition, plaintiff first testified that Williams told her to email him concerning Shannon's alleged harassment to reduce "anything" she could remember to writing. Pl. Dep. 55. Plaintiff also initially testified that she did not remember telling Williams about anything beyond the two incidents that are reflected in her emails, and about the male coworker who Shannon apparently subjected to homophobic slurs. Pl. Dep. 61-63.

Later in her deposition—and after the parties broke for lunch, Pl. Dep. 76—Sears-Barnett testified that she verbally told Williams about the additional harassing encounters. *Id.* at 122. He apparently then told her to "write down what happened as of the incident in February." *Id.* Only when defendants' counsel probed the issue a third time did plaintiff testify that Williams only told her to put the February 11 and 12, 2014 incidents down in writing. *Id.* at 124.

Sears-Barnett also claims that she spoke to Williams again on February 26, 2014, concerning the progress of his investigation into her complaint against Shannon. Dkt. 61-1, p. 8. Plaintiff sent herself an email that same day describing her conversation with Williams, and the allegations of harassment that she described to him. *Id.* The email appears to be redacted,

7

or at the very least the version in the record has lines missing from it.  *Id.*
But from the available text, the email recounts plaintiff telling Williams
about Shannon's slapping her backside on February 5, 2014, and about the
unbuttoned blouse incident in the summer of 2012.  *Id.*  To summarize,
plaintiff argues that the evidence shows that Williams knew of every incident
of harassment she claims Shannon subjected her to, and that she reported it
to him on multiple occasions in February of 2014.

Predictably, for their part defendants claim that Williams did *not* know of
any potential sexual harassment by Shannon against Sears-Barnett beyond
the incidents on February 11 and 12.  DSMF ¶ 14.  In support of that
assertion, defendants point to Williams' deposition, in which he denied ever
being told about Shannon unbuttoning her shirt in front of plaintiff.
Williams Dep. 52.  In fact, he denied that plaintiff told him about anything
beyond being "bumped into" and being "patted on her buttocks."  *Id.* at 53.

Whatever the extent of his knowledge as to Shannon's misconduct was,
Williams conducted an investigation into her behavior during the early
months of 2014.  DSMF ¶ 15.  As part of that investigation, Shannon
admitted to patting Sears-Barnett's backside on one occasion, and to using
profanity in an argument with a male employee.  *Id.* ¶¶ 16-17.

On April 2, 2014, Williams' investigation came to a close.
Williams Aff. p. 46.  As a result of Sears-Barnett's allegations of sexual

harassment, SCHC issued Shannon a final written warning (the "final warning").  *Id.*  That warning required that Shannon maintain strict adherence to SCHC's sexual and general harassment policies, as well as its global rules of conduct.  *Id.*  The final warning cautioned that "[c]ontinued instances of [harassing] conduct will not be tolerated and will result in immediate termination of employment."  *Id.*  According to Williams, he did not fire her outright because it was her first offense, and he believed that the conduct he had been presented with was insufficiently severe to merit an automatic firing.  Williams Dep. 51.

Sears-Barnett received confirmation of Shannon's discipline from Dr. Cowart, SCHC's president and CEO, on April 3, 2014, and then from Williams on April 9, 2014.  Williams Aff. pp. 48, 50.  Williams' letter told plaintiff that he "determined" that "Shannon's conduct . . . is considered unwelcomed, unprofessional, unacceptable," and not in SCHC's best interest.  *Id.* at 48.  The letter went on to explain that Shannon received "the appropriate corrective action" and that "continued instances of [her] conduct will not be tolerated and will result in immediate termination of [Shannon's] employment should there be a repeat occurrence."  *Id.*

In the immediate aftermath of Williams' investigation into Shannon, another of Sears-Barnett's coworkers took over as her supervisor.

DSMF ¶ 23.[4]  It was also "suggested" to Shannon that she should not have

direct contact with plaintiff, but if she did "it needed to be in a meeting

format."  Dkt. 61-6 ("Shannon Dep."), p. 23.  If she did have any contact with

plaintiff, she was told there needed to be someone else present as well.

*Id.* at 23-24.  According to plaintiff, the net result of this directive was that

she felt "invisible" to Shannon, but she can remember no other specific

altercations between the two of them after April 9 but before May 24 of 2014.

Pl. Dep. 75-76.

But May 27th brought with it a seismic shift in Sears-Barnett's

employment at SCHC.  On that day, plaintiff injured herself in the office.

DSMF ¶ 27.  More specifically, a drawer fell out of a filing cabinet plaintiff

was using and onto her foot, breaking her foot.  Pl. Dep. 83-85.

On May 28, 2014, Sears-Barnett applied for and received leave under the

Family and Medical Leave Act ("FMLA") because of her injured foot.

DSMF ¶ 28.  Plaintiff's FMLA leave lasted until August 18, 2014.  *Id.* ¶ 29.

Shortly before plaintiff's leave ran out, she submitted a doctor's note laying

---

[4] Plaintiff nominally disputes this fact.  To hear her tell it, this fact is not material, because Shannon remained employed by SCHC, which made her feel unsafe.  Plaintiff's response to this fact is improper twice over.  First, this fact *is* material.  Plaintiff brings a hostile work environment claim under Title VII, and as discussed below SCHC's response to her complaints is important evidence of her work experience as a whole.  Second, nothing about plaintiff's feeling unsafe with Shannon remaining employed makes defendants' factual statement inaccurate.  Because "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert[,]" the Court deems this fact admitted.  Local Rule of the Northern District of New York ("Local Rule") 56.1(b).

out the accommodations she would need to be able to return to work.
*Id.* ¶ 30.  SCHC provided accommodations in the form of limiting plaintiff's
time spent standing to no more than three five-minute periods per hour,
permitting her to perform sedentary work, and requiring her to walk only on
a limited basis.  Dkt. 52-3, p. 17.

So accommodated, Sears-Barnett returned to work on August 18, 2014.
DSMF ¶¶ 31-32.  But plaintiff's second stint at the office proved to be
short-lived.  A few hours into the workday, plaintiff left, citing a need for
medical care.  DSMF ¶ 33.  Plaintiff was treated at SCHC, where she
presented with a headache, dizziness, eye pain, and complained of feeling like
she might pass out.  Dkt. 61-1, p. 31.

Plaintiff had no direct contact with Shannon on August 18, 2014.
DSMF ¶ 34.  In fact, she has never had direct contact with Shannon since
May of 2014 except in the process of litigating this case.  *See id.* ¶ 35.  Even
so, plaintiff claims that Shannon did not cooperate with efforts to help
plaintiff log into her computer and made comments to others in her area that
plaintiff overheard.  PSMF ¶ 35.  Plaintiff specifically alleges that Shannon
said "[o]h she's here" in a sarcastic tone.  Pl. Aff. ¶ 19.

On August 20, 2014, Sears-Barnett had scheduled to take a day off for
personal reasons.  Dkt. 61-1, p. 29.  SCHC had approved that day off well in
advance.  *Id.* at 28.  But Shannon retracted that time off on August 18 at

11:03 a.m., because there was "work piled up" and plaintiff had "been out of work for several weeks." *Id.* at 27-28. A human resources employee at SCHC promptly responded that it was improper to deny an employee's leave request because she took FMLA leave, and recommended that Shannon re-approve the time off request, calling Shannon's retraction of approval "not good practice." *Id.* Shannon replied in that same email chain that she never had any intent to deny plaintiff FMLA leave. *Id.* It is unclear on the record whether plaintiff's leave was re-approved.

In any case, on August 21, 2014, Sears-Barnett advised SCHC's human resources department that she was being excused from work again because of her foot injury. DSMF ¶ 37. She would never return to work at SCHC again. *Id.* ¶ 36. Because plaintiff had already used up her FMLA leave, SCHC notified her that she needed to be placed on inactive status to permit her absence. *Id.* ¶ 38.

Several months followed with no contact between Sears-Barnett and SCHC regarding the scope and nature of her ongoing disability. DSMF ¶ 39. Plaintiff did not claim that she had been cleared to return to work, nor did she request any accommodations in the months following her unsuccessful attempt to return to the office. *Id.* Indeed, plaintiff was not cleared to return to work until December of 2015. *Id.* ¶ 41. Plaintiff also cannot recall any

accommodation requests that defendants failed to meet during this timeframe.  Pl. Dep. 121.

Finally, after months of radio silence, she received a letter from Williams dated December 1, 2014.  Williams Aff. p. 52.  That letter notified plaintiff that "[a]ccording to [SCHC policy[,] employees are eligible to remain on inactive status for up to six months from the original date of disability . . . ." *Id.*  Once those six months were up, the letter claimed that SCHC's policy called for termination.[5]  *Id.*  Plaintiff was initially disabled on May 27, 2014, so according to Williams, her six months were up as of November 27, 2014. By extension, plaintiff would have to be terminated effective as of that date. *Id.*

Shannon had no role in Sears-Barnett's firing, because she lacked the capacity to hire or fire her.[6]  DSMF ¶ 44.  The record evidence also indicates that decisions as to plaintiff's accommodations and medical leave were routed

---

[5] Plaintiff objected to defendants' statement of material facts to the extent that this policy actually existed.  Plaintiff's objections are pure argument, and she does not cite to any record evidence indicating that this policy does not, in fact, exist.  The Court can draw its own conclusions as to the existence of that policy, and plaintiff's objection does not raise a dispute of material fact.  That objection was improper.  *See, e.g., LaFever v. Clarke*, --- F. Supp. 3d ---,  2021 WL 921688,  at  *10 (N.D.N.Y. Mar. 11, 2021) (noting that response to statement of material facts was improper where it attempted to inject party's conclusions about evidence instead of countering statement of fact with record evidence).

[6] Once again, plaintiff objects to this fact as "not material."  Plaintiff appears to be conflating "not material" with "not advantageous to her case."   Although she is correct that the ability to hire and fire is not the alpha and the omega of the supervisory inquiry, it is still relevant to that inquiry. *See, e.g.*, *Ward v. Shaddock*, 2016 WL 4371752, at *10 (S.D.N.Y. Aug. 11, 2016) (noting that ability to hire, fire, or "effect a tangible change in [the employee's] terms or conditions of employment" are relevant to supervisory inquiry for vicarious liability under Title VII).  Because plaintiff did not provide a citation to record evidence indicating that Shannon did have the ability to hire or fire, the Court may—and does—deem this fact admitted.  Local Rule 56.1(b).

through the supervisor appointed to oversee plaintiff after April 9, 2014, as well as through SCHC's human resources.  *See* Dkt. 61-1, pp. 21-25 (email chain demonstrating considerations of plaintiff's leave and disability decisions being made by SCHC employees other than Shannon).  However, as plaintiff correctly points out, Shannon's ability to retract plaintiff's grant of leave on August 18, 2014, suggests that she did not cede all of her authority over plaintiff's employment status.  PSMF ¶ 46; Dkt. 61-1, pp. 27-29 (emails concerning Shannon's retraction of plaintiff's leave).

Sears-Barnett filed a complaint with the New York State Division of Human Rights in March of 2015.  DSMF ¶ 48.  Plaintiff received a right to sue letter on June 11, 2015.  Dkt. 2, ¶ 6.  Granted permission by that letter, plaintiff brought the present complaint in New York State Supreme Court, Onondaga County, on September 10, 2015.  Dkt. 2.  Defendants removed this case to federal court on April 13, 2016, relying on plaintiff's Title VII, ADA, and Rehabilitation Act claims for jurisdiction.  Dkt. 1.  Defendants moved for summary judgment at the close of discovery, and the Court heard oral argument on that motion.  Dkt. 52.

## III. <u>LEGAL STANDARD</u>

Summary judgment under Rule 56 is warranted if the entirety of the parties' submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing

FED. R. CIV. P. 56(a)).  A fact is "material" if it "might affect the outcome of

the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  And a dispute of a material fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id.*  The movant bears the burden of pointing the court to

the materials that it believes demonstrate the absence of a genuine issue of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Additionally, a court considering a summary judgment motion "must

resolve any ambiguities and draw all inferences from the facts in a light most

favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321,

327 (N.D.N.Y. 2017) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553

(2d Cir. 2005)).  Even so, a non-movant's conclusory allegations without

support from record evidence are insufficient: the non-movant must "put up

or shut up."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  At

bottom, summary judgment tasks the Court with assessing the assembled

evidence and determining whether a reasonable factfinder could find in the

nonmovant's favor.  *Treglia v. Town of Manlius*, 313 F.3d 713, 719

(2d Cir. 2002).

## IV. <u>DISCUSSION</u>

Defendants argue that Sears-Barnett has failed to present evidence demonstrating a genuine dispute of material fact for any of her claims. Those claims come under both state and federal law. But this being a federal court, with jurisdiction inherently limited by the federal structure, the Court will first consider her federal claims. Should any of those claims survive to sustain federal jurisdiction, the Court will consider defendants' motion as to her state law claims.

Sears-Barnett's federal claims come under four headings. Plaintiff brings: (1) a Title VII hostile work environment claim; (2) a Title VII retaliation claim; (3) a disability discrimination claim under the ADA and Rehabilitation Act; and (4) a retaliation claim under both the ADA and the Rehabilitation Act. However, before the Court gets into the merits on any of plaintiff's claims, the first question to be answered is whether she can bring those claims against Shannon, an individual.

## A. **Plaintiff's Individual Claims**

It is immediately clear that Sears-Barnett cannot. The Second Circuit has left no doubt that "individuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) (internal citations omitted). Although the Circuit has been less forthcoming about individual liability under the ADA, at the least it has held that its retaliation provision borrows from Title VII to such an extent that individual liability is also

16

unavailable to retaliation claims.  *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) (holding that "the retaliation provision of the ADA . . . cannot provide for individual liability").

Based on the Second Circuit's guidance thus far, district courts under its supervision have routinely held that there is no individual liability at all under the ADA or the Rehabilitation Act.  *Thomas v. New York City Dep't of Educ.*, 938 F. Supp. 2d 334, 354-55 (E.D.N.Y. 2013) (collecting cases for proposition that courts in this Circuit do not typically allow ADA claims against individuals); *J.L. ex rel. J.P. v. New York City Dep't of Educ.*, 324 F. Supp. 3d 455, 467 n.4 (S.D.N.Y. 2018) (holding no individual liability for Rehabilitation Act).

Sears-Barnett has not meaningfully advocated for this Court to deviate from that routine practice.  Instead, she argues that Shannon would be liable under the NYSHRL as an aider and abettor.  The Court may revisit that issue if the need arises, but for the purposes of her federal claims plaintiff appears to have conceded that the weight of case law is against her. Accordingly, plaintiff's Title VII, ADA, and Rehabilitation Act claims under Counts I, III, V, and VII must be dismissed against Shannon.[7]  In other words, plaintiff must prove that SCHC itself is liable for the torts she alleges.

---

[7] The same holds true for the John and Jane Does lingering in this case's caption.

**B. Title VII Hostile Work Environment**

The first tort Sears-Barnett claims against SCHC is for a hostile work environment in violation of Title VII.  That claim calls plaintiff to prove that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019).  Answering that question has both an objective element and a subjective one.  *Id.*  Objectively, "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive[.]"  *Id.*  Subjectively, "the victim . . . must perceive the work environment to be abusive."  *Id.*

The objective prong considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2d Cir. 2010) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  The circumstances comprising that totality typically must be more than episodic.  *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020).  Instead, the plaintiff must demonstrate continuous and concerted misconduct, or else

18

misconduct that is so extreme that it makes her work environment hostile standing alone.  *Id.* at 103.

However, equally relevant as what a plaintiff bringing a hostile work environment claim must prove is how they must prove it.  To that end, there are two ways to hold an employer liable for a hostile work environment claim. *Bentley*, 935 F.3d at 91.  If an employee's supervisor created the hostile work environment, the employer is strictly vicariously liable for that supervisor's misconduct.  *Id.*  But if the environment was created by a coworker rather than a supervisor, the plaintiff must prove that the employer was negligent regarding the environment or else failed to remedy it once it was brought to the employer's attention.  *Id.*

As might be expected, the parties do not agree as to whether Shannon qualifies as an employer, and thus whether the relevant standard is strict vicarious liability or negligence.  In either case, Sears-Barnett has failed to establish a hostile work environment as a matter of law.

Let us assume, as the Court must on summary judgment, that Shannon engaged in a pattern of sexually harassing behavior beginning in the summer of 2012 with unbuttoning her blouse in front of Sears-Barnett.  Let us further assume that Shannon's harassment did not end until February 12, 2014 with Shannon's alleged comment of being unable to keep her hands off of plaintiff. Pl. Aff. ¶ 8; Williams Aff. p. 40.

Holding those assumptions in mind, the next question is whether Shannon was Sears-Barnett's supervisor, and the extent to which SCHC can be charged with Shannon's conduct.  Whether Shannon supervised plaintiff or not, that question ultimately turns on the effectiveness of SCHC's response to plaintiff's complaint.

After all, to the extent Shannon was Sears-Barnett's coworker, an employer is not negligent if it takes appropriate remedial action to address a coworker's (and not a supervisor's) harassment of which the employer either was aware or should have been aware.  *See Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009).

"The appropriateness of an employee's remedial action must be assessed from the totality of the circumstances."  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014).  In the Second Circuit, that means courts should gauge whether an employer acted "in good faith[ by] tak[ing ] those measures which are both feasible and reasonable under the circumstances." *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1104 (2d Cir. 1986).  Additionally important to the inquiry is whether the employer's action was effective and prompt.  *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 329 (N.D.N.Y. 2013).

If Shannon was merely Sears-Barnett's coworker, SCHC has provided ample evidence that it took appropriate remedial action to address the sexual harassment plaintiff alleged.

As the record makes all too plain, SCHC took remedial action by disciplining Shannon based on Sears-Barnett's complaint.  Williams Aff. p. 46.  That discipline was not an empty slap on the wrist, either.  *Id.* Instead, Shannon was issued a final warning that any other misconduct would result in her immediate firing.  *Id.*  SCHC also replaced Shannon as plaintiff's supervisor at least in some respects.  DSMF ¶ 23; *but see* Dkt. 61-1, pp. 27-29 (Shannon retracting plaintiff's leave well after being removed as supervisor).  The scope of SCHC's remedial measures suggests good faith on its part in addressing plaintiff's concerns.  *Snell*, 782 F.2d at 1104 (tasking employers with acting in good faith to address employee's claims of harassment).

As for the effectiveness of SCHC's disciplinary measures, by all appearances they worked.  Sears-Barnett does not identify any further sexual harassment after the final warning.  *See* Pl. Dep. 75-76.  Although she complained of Shannon ignoring her after her complaint, that was if anything part of SCHC's suggestion that Shannon minimize any one-on-one contact with plaintiff.  *Id.*; Shannon Dep. pp. 23-24.  There is no question that SCHC's remedial measures were effective, and given their effectiveness they

were implicitly reasonable.[8]  *See Snell*, 782 F.2d at 1104 (requiring employers to take reasonable remedial actions); *Bader*, 985 F. Supp. 2d at 329 (noting that employers must take effective remedial action).

Now, Sears-Barnett may—and does—object that SCHC tarried too long in bringing that result about, and that the remedial action was not prompt.  But no reasonable jury could conclude that the only possible outcome to plaintiff's sexual harassment complaint was Shannon's immediate discipline without an investigation.  This is especially true because plaintiff's complaint was the first complaint of its type that any SCHC employee had ever lodged against Shannon.  Williams Dep. 51.

True, seven weeks is not an insubstantial period of time to conduct what seems to be a straightforward investigation.  *Compare* DSMF ¶ 12 (plaintiff filed complaint on February 12, 2014), *with* Williams Aff. p. 46 (issuing final warning on April 2, 2014).  However, the law simply cannot require sending SCHC to trial because they did not immediately discipline a supervisory employee upon the first allegation of sexual harassment levied at her, especially when plaintiff has provided no evidence of further harassment in the intervening period between her complaint and Shannon's receipt of the

---

[8] To the extent that plaintiff argues Shannon should have been fired as a result of her complaint, that argument does not raise a question of fact as to whether SCHC's remedial action was reasonable.  As discussed below, SCHC could not have been required to fire Shannon in the first instance of misconduct.

final warning.  *See Swenson v. Potter*, 271 F.3d 1184, 1196-97 (9th Cir. 2001) ("Title VII 'in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser.'" (citing *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997)).

Indeed, other courts to consider the issue have found that a remedial action begins with the investigation, and thus the timeline to reach a conclusion is not as determinative when the employer actively investigates the claim.  *See, e.g., Allen v. Babcock & Wilcocx Tech. Servs. Pantex, LLC*, 2013 WL 5570192, at *11 (N.D. Tex. Oct. 9, 2013) (noting that remedial action was prompt because employer began investigation by convening meeting to determine reasonable next steps).

Accordingly, that it took so long for SCHC to reach a final determination on how to permanently address plaintiff's complaint is not enough for a reasonable factfinder to take issue with SCHC's remedial action.  *See Allen*, 2013 WL 5570192, at *11 (finding no question of fact as to effectiveness of remedial action when period from plaintiff's complaint to final adjudication of complaint lasted only two months).  As a result, Sears-Barnett has not raised a question of fact as to the effectiveness of SCHC's remedial action, and Shannon's alleged sexual harassment could not factor into her hostile work environment claim if Shannon were only her coworker.

Alternatively, if the Court assumes that Shannon was Sears-Barnett's supervisor,[9] her hostile work environment claim still fails as a matter of law because of SCHC's antiharassment policies and its effective use of those policies. Although the general rule for a harassing supervisor is that the employer is strictly vicariously liable, an employer can defeat that liability through the affirmative defense first handed down by the Supreme Court in *Faragher v. Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) (the "*Faragher* defense").

The *Faragher* defense has two elements: (1) the employer exercised reasonable care to prevent and correct any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities available to her.[10] *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

---

[9] The Court gives plaintiff a substantial benefit of the doubt in doing so. Even drawing all reasonable inferences in her favor, the only evidence plaintiff has mustered as to Shannon's ability to alter the conditions of her employment is Shannon's ability to grant and retract plaintiff's leave requests on two occasions. Williams Aff. p. 37; Dkt. 61-1, pp. 27-29. This threadbare showing is likely insufficient to establish that Shannon supervised plaintiff. But, because for the reasons that follow defendants are entitled to summary judgment against plaintiff's claim in any case, the Court need not reach so far as to hold that Shannon did not supervise plaintiff.

[10] The *Faragher* defense for an employer's strict liability for a supervisor's misconduct is not available if the supervisor's harassment culminates in a tangible employment action against the plaintiff. *Vance*, 570 U.S. at 424. That exception does not apply, because plaintiff has not pointed to an adverse employment action that she can tie to Shannon in this case. *See* DSMF ¶ 44 (noting that Shannon had no authority to hire or fire); *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004) (noting that "humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions" constitutes adverse employment action for purposes of *Faragher* defense).

Applying the *Faragher* defense to these facts, the existence of an anti-harassment policy and a complaint procedure—coupled with SCHC actively using that procedure to rectify plaintiff's complaint—soundly establishes SCHC's reasonable care in preventing and correcting harassing behavior to satisfy the first prong of the *Faragher* defense. *See, e.g.*, *Petro v. Outback Steakhouse*, 2006 WL 273133, at *4 (N.D.N.Y. Jan. 31, 2006) (finding first prong of affirmative defense against strict liability for supervisor harassment met where defendant company had anti-harassment policy and complaint procedure).

The record also leaves no doubt that Sears-Barnett was aware of that policy and how it functioned.  DSMF ¶ 7 (plaintiff admitting she received copies of anti-harassment policies); *cf.* Williams Aff. pp. 25-36 (plaintiff complaining to Williams about Shannon's improperly retracting her leave). In fact, plaintiff eventually used that policy to challenge the precise conduct she complains of.  DSMF ¶ 12.

That said, to a certain extent Sears-Barnett's invocation of SCHC's anti-harassment policies precludes the application of the *Faragher* defense. Remember, to prove the second prong of that defense SCHC must furnish evidence that plaintiff unreasonably failed to avail herself of the employer's antiharassment policy.  *Vance*, 570 U.S. at 424.  As a consequence, to the extent that plaintiff's complaint amounts to a reasonable invocation of

SCHC's policy, the *Faragher* defense is unavailable.  *Id.*  If the Court assumes that plaintiff told Williams about Shannon touching her on February 5, 11, and 12, that amounts to plaintiff's reasonable use of that policy for those claims of harassment.  Pl. Aff. ¶ 11.

But Sears-Barnett alleges two years' worth of sexual harassment.  *See* Pl. Aff. ¶ 8 (plaintiff complaining that Shannon unbuttoned her blouse in front of her in 2012); Williams Aff. p. 40 (plaintiff complaining Shannon touched her on February 12, 2014 and claimed she was having trouble keeping her hands to herself).

That Sears-Barnett eventually complained of Shannon's alleged sexual harassment only underscores the two years of silence that preceded that complaint.  She knew the policy, claims that Shannon began harassing her in 2012, and still kept this alleged pattern of harassment to herself for almost two years.  In the absence of any specific events with so much as a general timeframe attached to them between the summer of 2012 and February 5, 2014, the Court has no basis to consider the general pattern of misconduct plaintiff alleges between those two points.

SCHC has therefore sufficiently established the *Faragher* defense as to Sears-Barnett's claims of sexual harassment predating February 5, 2014. *See, e.g.*, *Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162-63 (2d Cir. 2006) (summary order) (affirming dismissal of hostile work

environment claim using affirmative defense to defeat vicarious liability because plaintiff failed to complain about sexual harassment for three years).

Stripping away Sears-Barnett's earlier allegations of a pattern of harassment by Shannon, her hostile work environment claim fails as a matter of law.[11]  Under the most generous reading of the facts available to sustain plaintiff's hostile work environment claim, the sum total of incidents plaintiff complains of amounts to: (1) three instances of sexual harassment across one week; (2) Shannon's treating her as if she were "invisible" after receiving the final warning; (3) her unease at Shannon's continued employment at SCHC; (4) Shannon's not helping her log into her computer on August 18, 2014; (5) Shannon's comment of "[o]h she's here" on the same day; (6) Shannon's retracting her scheduled leave on August 20, 2014; and (7) her termination.  Pl. Dep. 75-76; Pl. Aff. ¶¶ 5, 19; Williams Aff. p. 52; Dkt. 61-1, pp. 27-29.

That showing cannot be enough.  To begin, because of SCHC's disciplinary action toward Shannon, there is no evidence in the record of further sexual harassment after February 12, 2014.  That fact undermines Sears-Barnett's ability to prove a hostile work environment in two meaningful ways.  First, it presents a finite, isolated period of time in which plaintiff was subjected to an

_____

[11] Of course, if Shannon were only plaintiff's coworker, plaintiff could not even rely on these three incidents because for the reasons described above SCHC cured those instances of sexual harassment with a reasonable remedial action.

objectionable workplace.  Second, a reasonable employee would hardly be able to find their workplace to be pervasively discriminatory if their employer actively took successful steps to protect them from abuse.  *Bentley*, 935 F.3d at 90 (noting that hostile work environment requires environment sufficiently severe to be considered hostile by reasonable employee). Accordingly, the three instances of sexual harassment potentially attributable to SCHC do not provide good evidence that plaintiff's work environment rose to the level of hostility.

Next, Sears-Barnett's complaints of Shannon's chilly demeanor toward her after receiving the final warning contribute nothing to proving a hostile work environment.  *See, e.g.*, *Corso v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2019 WL 2869573, at *10 (N.D.N.Y. July 3, 2019) (noting that being ignored and isolated by supervisors does not amount to hostile work environment claim).  This is especially true because it was at least suggested to Shannon that she minimize contact with plaintiff after the results of the investigation came to light.  Shannon Dep. 23.  No reasonable employee would object to conduct calculated to protect her from sexual harassment.  *Bentley*, 935 F.3d at 90.

Sears-Barnett's discomfort at Shannon remaining employed at SCHC is also not enough to maintain her hostile work environment claim.  It is true that she has affirmed that she remained disquieted by Shannon's presence.

Pl. Aff. ¶ 18.  But for the reasons discussed above, SCHC was not obligated to fire Shannon for her misconduct.  Accordingly, though the Court understands plaintiff's discomfort, that is not enough to constitute a hostile work environment, whether alone or in conjunction with plaintiff's other evidence.

As for the remainder of Sears-Barnett's complaints about her workplace, she has provided no evidence tying any of these actions to her sex.  After all, Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  Instead, that statute is intended to combat discrimination at work.  *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979) (noting that purpose of Title VII is to eliminate discrimination in the workplace).  Without a scintilla of evidence from which a rational finder of fact could conclude that Shannon's comments, plaintiff's retracted leave, or her firing were a result of her gender, plaintiff cannot demonstrate that these remaining complaints created the requisite discriminatory workplace to satisfy plaintiff's hostile work environment claim.  *Bentley*, 935 F.3d at 90.

In other words, considering the totality of the circumstances Sears-Barnett's claims present, no reasonable employee could conclude that plaintiff's work environment was so pervasively infected with discrimination that it was hostile.  *Bentley*, 935 F.3d at 90.  Plaintiff's Count I hostile work environment claim under Title VII must therefore be dismissed.  *See, e.g.*,

*Durant v. A.C.S. State & Loc. Sols. Inc.*, 460 F. Supp. 2d 492, 498 & n.3 (S.D.N.Y. 2006) (granting summary judgment against hostile work environment claim because even if sexual harasser was employer for purposes of imputing liability "[i]f there is a [sexual harassment] policy, and if the policy is invoked . . . to redress the harassment . . . the employee has no basis to complain.").

### C. **ADA and Rehabilitation Act Discrimination**

Sears-Barnett next argues that SCHC discriminated against her on the basis of disability in violation of both the ADA and the Rehabilitation Act. Those two statutory schemes serve slightly different purposes. The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). By contrast, the Rehabilitation Act aims to "empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society[.]" 29 U.S.C. § 701(b)(1). Even so, discrimination claims under either statute are analyzed under the same standard. *Piligian v. Icahn Sch. of Med.*, --- F. Supp. 3d ---, 2020 WL 5758752, at *4 (S.D.N.Y. Sept. 28, 2020).

As with most employment discrimination claims, summary judgment motions for ADA and Rehabilitation Act claims are considered through the burden-shifting framework the Supreme Court handed down in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Sista v. CDC*

*Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (applying burden-shifting framework to ADA discrimination claim); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002), *superseded by statute on other grounds* (same for Rehabilitation Act claim).

That framework tasks courts with three stages of analysis.  In the first, the plaintiff must provide a showing to support her prima facie claim. *McDonnell Douglas*, 411 U.S. at 802.  If she meets that initial burden, the defendant must counter her showing by demonstrating a legitimate, nondiscriminatory reason for the adverse action the plaintiff complains of. *Id.*  Should the defendant also succeed in making that showing, the burden shifts back to the plaintiff for a final time to provide evidence that the employer's legitimate reason was mere pretext.  *Id.* at 804.

The elements of a prima facie disability discrimination claim under either the ADA or the Rehabilitation Act are: (1) the employee is "a person with a disability under the meaning of the statute in question"; (2) "an employer covered by the statute had notice of [her] disability"; (3) "with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue"; and (4) "the employer has refused to make such accommodations." *Natofsky v. City of N.Y.*, 921 F.3d 337, 352 (2d Cir. 2019) (cleaned up).  The plaintiff must also show a causal connection between the employer's failure to accommodate, an eventual adverse employment action, and any subsequent

31

performance deficiencies on the plaintiff's part used to explain that adverse action.  *See Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 108 (2d Cir. 2001) (requiring causal connection between deficiencies, failure to accommodate, and adverse action).

Sears-Barnett fails on her initial showing because she has provided no evidence that SCHC has failed to accommodate her foot injury, and by necessary extension that a failure to accommodate caused her adverse employment action.  Even considering all of the evidence in the light most favorable to plaintiff, it is impossible to come away from the facts of this case with any clear idea of what SCHC did in reference to her injury that plaintiff objects to.

Sears-Barnett does not dispute that, except for a few hours on August 18, 2014, she did not work between May 27th and December 1, 2014. DSMF ¶¶ 27, 31-32, 36.  She also does not dispute that she did not contact SCHC at all concerning her availability to come back to work or any accommodations that could help make her return possible between August 21, 2014, and her termination on December 1, 2014.  *Id.* ¶¶ 36, 39; Williams Aff. p. 52.  Perhaps most importantly of all, plaintiff does not dispute that SCHC made all necessary accommodations to allow her to return to work, however briefly, on August 18, 2014.  DSMF ¶¶ 31-32.

In light of these undisputed facts, it is difficult to see how Sears-Barnett hopes to prove out her prima facie case.  Her only arguments in support of her disability discrimination claims are that the ADA provides a right to a leave of absence, *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 185 & n.5 (2d Cir. 2006), and that the employee need not affirmatively request accommodations if the injury at issue is obvious, *Brady v. Wal-Mart Stores Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).

Both of those arguments fail.  As to the first, Sears-Barnett is correct that in appropriate circumstances a leave of absence may be an accommodation for a disability.  *See Graves*, 457 F.3d at 185 (noting question of fact existed as to whether plaintiff was entitled to leave of absence for "maybe a couple weeks" to see foot specialist).  But that right is not unlimited, and plaintiff asks for far too much by suggesting that SCHC should have held her position open for her without any indication of when or if she would be able to return. *Parker v. Sony Pictures Ent., Inc.*, 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover[.]").

This is especially true when Sears-Barnett does not dispute that she did not communicate with SCHC at all about her rehabilitation progress or a potential timeline for her return to work.  DSMF ¶ 39.  As it turned out,

plaintiff was only cleared to return to work in December of 2015. *Id.* ¶ 41. No reasonable juror could conclude that SCHC should have held plaintiff's position open for her from May 27, 2014, until December of 2015, especially not without any meaningful effort by plaintiff to keep in touch as to her progress. Plaintiff's reliance on her right to a leave of absence does not amount to a reasonable accommodation, and that argument must be rejected.

Sears-Barnett's second argument that she had no need to apprise SCHC of her need for accommodations because her injury was obvious fares no better. Of course, plaintiff is correct that an employer has a duty to accommodate an employee with an obvious disability. *Brady*, 531 F.3d at 135-36. However, that duty is satisfied by engaging in an interactive process with the employee to figure out a means to accommodate her. *See id.* (noting that employer must engage in interactive process to determine ability for reasonable accommodation if employer reasonably should have known employee was disabled).

Sears-Barnett does not genuinely dispute that SCHC engaged in this process. Once again, she admits that SCHC accommodated her injury by minimizing her time walking and standing. DSMF ¶ 31; Dkt. 52-3, p. 17. In fact, when pressed at deposition for an example of what SCHC failed to do to allow plaintiff to return to her job with reasonable accommodations, plaintiff had no answer. Pl. Dep. 121. In other words, all available evidence

demonstrates that if anyone failed to participate in the interactive process of coming up with a reasonable accommodation to allow plaintiff to return to work, it was plaintiff herself.  *Brady*, F.3d at 135-36; PSMF ¶ 39 (plaintiff admitting she did not contact SCHC to advise concerning return to work or additional requisite accommodations).

Sears-Barnett cannot blame SCHC for discriminating against her disability by failing to accommodate her when she has not provided any evidence at all that SCHC failed to work with her to provide a reasonable accommodation that would allow her to keep her job.  As a consequence, plaintiff has failed to establish an essential element of her prima facie case of disability discrimination, and thus her Count V discrimination claims under the ADA and the Rehabilitation Act must be dismissed.  *See, e.g.*, *Parker*, 204 F.3d at 338 (noting that employer need not hold injured employee's position open indefinitely).

## D. <u>Retaliation</u>

In addition to her claims of a hostile work environment under Title VII and discrimination under the ADA and the Rehabilitation Act, Sears-Barnett also brings a retaliation claim under all three statutes.  At summary judgment, those claims are all again construed under the *McDonnell Douglas* burden-shifting scheme.  *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015).

To establish a prima facie case of retaliation under all of the three statutes upon which Sears-Barnett relies, an employee must show that: (1) she was "engaged in protected activity" under the law supporting her claim; (2) "the employer was aware of that activity"; (3) the employee suffered a "materially adverse action"; and (4) there was "a causal connection between the protected activity and that adverse action." *Agosto*, 982 F.3d at 104 (establishing elements of Title VII retaliation); *Piligian*, 2020 WL 5758752, at *5-6 (providing same elements for retaliation under ADA and Rehabilitation Act).

An employer's action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014). The converse is also true: a trivial harm that would not dissuade an employee from making a discrimination claim does not qualify as a materially adverse action. *Id.* Where a potential adverse action falls on the spectrum between those two points is an objective test, based on the reactions of a reasonable employee in the plaintiff's shoes. *Id.*

As for causation, a plaintiff can establish that element by establishing that "the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (citation omitted). For Title VII claims, a plaintiff must establish that her protected activity was the but-for cause of her adverse

employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).  Although the law in this Circuit is unsettled as to the causation standard imposed in ADA and Rehabilitation Act retaliation claims, most courts have nevertheless imported the but-for causation standard to these claims as well for the same reasons.  *See, e.g.*, *Monsour v. N.Y. State Off. For People with Developmental Disabilities*, 2018 WL 3349233, at *11 n.17 (N.D.N.Y. July 9, 2018) (explaining reasons for imposing but-for causation standard on Rehabilitation Act and ADA claims).

The only adverse action that Sears-Barnett identifies for any of her retaliation claims is her being fired.  Accordingly, the analysis for all three claims is largely identical, with the one exception being that her protected activity is different for her Title VII claim than it is for her ADA and Rehabilitation Act claims.

For Sears-Barnett's Title VII claim, she has identified a viable protected activity through her complaint against Shannon.  *See Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 235, 239 (N.D.N.Y. 2010) (noting that sexual harassment complaint indisputably qualifies as protected activity under Title VII).  However, tying that protected activity to her eventual termination proves to be too tall an order for plaintiff to fill.

Sears-Barnett filed her complaint against Shannon on February 12, 2014, but was only terminated nearly ten months later, on November 27, 2014.

37

Williams Aff. p. 52; DSMF ¶ 12.  That ten-month gap is far too long to sustain an inference of causal connection on its own.  *See, e.g.*, *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 387-88 (S.D.N.Y. 2014) (noting that "temporal gap of more than six months . . . is unable to support an inference of causation that could defeat summary judgment").

Nevertheless, Sears-Barnett argues that she has direct evidence of animus, and by extension the lengthy gap between protected activity and adverse action is of no consequence.  The Court has scoured the record and found no evidence of a direct retaliatory animus by SCHC motivating plaintiff's firing.  Nor do plaintiff's papers elaborate on what that evidence might be.  As a consequence, plaintiff has failed to establish a prima facie case of retaliation under Title VII, and her Title VII retaliation claim under Count III must be dismissed.

The analysis for Sears-Barnett's ADA and Rehabilitation Act retaliation claims looks different, but reaches the same result.  Plaintiff's activities protected by those statutes were her requests for accommodations.  *Lawton v. Success Acad. Charter Schs., Inc.*, 323 F. Supp. 3d 353, 366 (E.D.N.Y. 2018) (noting that requesting accommodations is protected activity under Rehabilitation Act); *Conley v. United Parcel Serv.*, 88 F. Supp. 2d 16, 20 (E.D.N.Y. 2000) (same for ADA).  Plaintiff made three requests for accommodations: her request to limit the need for her to stand and walk at

work in advance of her return to work in August of 2014 and her two requests for leaves of absences on May 27, 2014 and August 21, 2014. *See Graves*, 457 F.3d at 185 (noting that request for finite leave of absence can constitute request for reasonable accommodations).

Unlike the sizeable ten-month gap that tripped up plaintiff's Title VII retaliation claims, a three-month span between late August and the end of November is not quite so apparently insufficient. Even so, many courts have held that a two-to-three-month temporal distance between protected activity and allegedly retaliatory act is still not enough to establish causation without additional evidence of retaliatory animus. *See Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 308 (W.D.N.Y. 2014) (collecting cases for proposition that two to three months between request for accommodations and allegedly retaliatory act was insufficient without other evidence of causation).

Once again, Sears-Barnett has failed to come forward with any additional evidence of retaliatory animus for SCHC's decision to fire her. Thus, the three-month gap between her most recent request for accommodations and her firing is insufficient to establish causation. *See Housel*, 6 F. Supp. 3d at 308.

But even assuming that the three-month gap was enough to support causation, and indeed assuming that Sears-Barnett has managed to establish a prima facie case that her firing was retaliatory, her claim would still fail.

Plaintiff has provided no evidence that SCHC's professed non-discriminatory reason for firing her—namely plaintiff's six-month absence from work with no end in sight—was pretextual.

No reasonable factfinder could conclude that Sears-Barnett was fired because of her requests for accommodations, or even for her requests for leaves of absences.  Instead, the record unequivocally demonstrates that plaintiff was fired because after six months of being out of work—less a few hours on August 18, 2014—SCHC had no idea if or when plaintiff would return.

Sears-Barnett makes only three meaningful attempts to argue otherwise. First, she repeats her conclusory claims that she has furnished evidence of retaliatory animus.  Again, if that evidence exists, the Court cannot find it and she has provided no specifics to so much as steer the Court in its direction.  That argument must be rejected.

Second, to Sears-Barnett's mind the fact that SCHC used May 27, 2014, the date of her disability, instead of August 21, 2014, the date she went on inactive status, to calculate the six-month period that triggered her firing speaks to pretext.  This argument must be rejected as well.  Although plaintiff did return to work in August of 2014, she stayed for only a few hours before once again taking her leave.  DSMF ¶ 33.  The cause of her leave remained the same: her broken foot.  *Id.* ¶ 37.  Effectively, then, plaintiff was

continuously out of work due to her foot injury beginning in May, and SCHC's use of this date to start the clock running on her inactivity does not provide evidence of pretext sufficient to persuade a reasonable factfinder.

Third, Sears-Barnett argues that SCHC has failed to point to any written policy requiring the termination of an inactive employee after six months. As she would have it, if such a policy existed it would be written down, and if it were written down, it would have turned up in discovery. Yet even assuming that plaintiff is correct and SCHC has no formal policy of automatically terminating employees after six months of inactive status, she would still need to prove that retaliation for her protected activities was the true motive for her firing. *See Hexemer v. Gen. Elec. Co.*, 2015 WL 3948418, at *9 (N.D.N.Y. June 29, 2015) (citing *Quarantino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995)).

She cannot. Of course, a false explanation for an adverse action allows for an inference of discrimination in the appropriate circumstances. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). But Sears-Barnett has failed to provide evidence that her claims can sustain that inference. In every paper referring to plaintiff's termination, SCHC cited her six-month absence from work as its reason for firing her, providing consistency to SCHC's narrative. Williams Aff. pp. 52-53. In addition, SCHC's track record of accommodating plaintiff whenever she requested it

41

makes the likelihood of her being fired for those requests dubious, to say the least.  DSMF ¶ 31.

In short, whether SCHC had a formal policy of terminating inactive employees after six months or not, no reasonable juror could conclude that retaliating against her was the true motive for firing her.  SCHC's repeated accommodations of her injury, her six-month absence from work, and her absolute silence about her intentions to return to work speak far too loudly for plaintiff's meager showing of a lack of a written policy to sustain her claim.  And of course, if no reasonable factfinder could conclude that retaliation was SCHC's true motive for firing her, plaintiff cannot prove its stated reasons were pretextual.  Accordingly, Sears-Barnett's ADA and Rehabilitation Act retaliation claims under Count VII must be dismissed.[12] *Cf. Parker*, 204 F.3d at 338 (noting that employer could not be required to hold position open indefinitely for injured employee).

---

[12] The Court notes, however, that Shannon's retraction of plaintiff's time off could potentially also qualify as an adverse action as that term is defined for retaliation claims.  *See Wharton v. Cty. of Nassau*, 2013 WL 4851713, at *12 (E.D.N.Y. Sept. 10, 2013) (noting that denying time off requests constitute adverse actions for purposes of retaliation claims); Dkt. 61-1, pp. 27-29 (Shannon discussing having retracted plaintiff's leave in August 2014).  But at no point, whether in the pleadings or in response to defendants' motion for summary judgment, has plaintiff argued that Shannon's retraction of leave constituted retaliation.  In fact, the issue is apparently of such little importance to both parties that as things stand now it is entirely nebulous as to whether plaintiff was ultimately docked that time off or if Shannon did as human resources suggested and restored the leave request.  In the absence of any effort by plaintiff—a counseled litigant—to ever argue that she has a viable retaliation claim based on Shannon's retracting her leave, the Court deems that potential claim to be abandoned.  *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (noting that district courts have discretion to deem claims abandoned where counseled plaintiff does not defend claim on summary judgment).

### E. <u>Plaintiff's State Law Claims</u>

Sears-Barnett's complaint now stands without a single federal claim to support jurisdiction in this Court.  Defendants relied on federal question jurisdiction under 28 U.S.C. § 1331 to remove this case to this Court, and trusted the supplemental jurisdictional provisions of 28 U.S.C. § 1367 to bring plaintiff's state law claims along.  Dkt. 1, ¶ 3.

A district court that has dismissed all federal claims in a case relying on federal question jurisdiction may decline to exercise supplemental jurisdiction over any lingering state law claims.  28 U.S.C. § 1367(c)(3).  But first, that court must consider "the values of judicial economy, convenience, fairness, and comity" before making the choice to keep or dispose of the case.  *Kroshnyi v. U.S. Pack Courier Servs.*, 771 F.3d 93, 102 (2d Cir. 2014) (internal citations and quotation marks omitted).  Those considerations point toward disclaiming jurisdiction in a healthy majority of cases.  *See Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) ("[I]f a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." (internal citations and quotation marks omitted)).

The Court sees no cause to depart from the standard rule.  Although this case has proceeded far in the federal system, the fact remains that state courts are better equipped to deal with state law claims than are federal ones.  In addition, Sears-Barnett initially filed her complaint in state court,

and in the absence of a federal claim affording jurisdiction, her preference further supports seeing this case resolved in state court. Accordingly, the remainder of the complaint must be remanded to New York State Supreme Court, Onondaga County.[13]

## V. **CONCLUSION**

After reviewing Sears-Barnett's federal claims, the Court is unsure what more she wanted from SCHC. Plaintiff complained of sexual harassment, and her harasser was disciplined. Perhaps that discipline was not as swift or as absolute as plaintiff would have liked, but federal law cannot require an employer to follow a complaining employee's every wish in the handling of her complaint. Nor can the law require that every complaint result in immediate termination of its addressee.

Similarly, when Sears-Barnett was injured in the office, SCHC permitted her a six-month absence before terminating her. Federal law also cannot charge SCHC to keep plaintiff's job open forever, despite her refusal to communicate with it as to her intentions to return. It may be that plaintiff can attain a different result in state court, but plaintiff's federal claims must be dismissed.

Therefore, it is

---

[13] A district court that declines to exercise supplemental jurisdiction in a removed case has discretion to remand the claims or to dismiss them without prejudice. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988) (holding that district courts have discretion to remand removed cases and need not always dismiss them).

ORDERED that

1.  Plaintiff Tisha Sears-Barnett's Claims under Counts: (I) hostile work environment in violation of Title VII; (III) retaliation in violation of Title VII; (V) discrimination in violation of the ADA and the Rehabilitation Act; and (VII) retaliation in violation of the ADA and the Rehabilitation Act are DISMISSED WITH PREJUDICE; and

2.  Counts (II) sex discrimination under the NYSHRL; (IV) retaliation for a sexual harassment complaint under the NYSHRL; (VI) disability discrimination under the NYSHRL; (VIII) disability retaliation under the NYSHRL; (IX) intentional infliction of emotional distress; and (X) negligence and gross negligence are REMANDED to New York State Supreme Court, Onondaga County.

3.  The Clerk of Court is directed to enter judgment accordingly, forward this decision and the case file to the New York State Supreme Court, Onondaga County, and close the case file.

IT IS SO ORDERED.

Dated:  March 31, 2021
  Utica, New York.

David N. Hurd
U.S. District Judge